**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| WYNDHAM VACATION RESORTS, INC., and, WYNDHAM VACATION MANAGEMENT, INC., | ) ) ) ) | |
|      Plaintiff, | ) ) | **Case No. 2:12-cv-00096** |
| v. | ) ) | **Judge Aleta A. Trauger** |
| THE CONSULTANT GROUP, SMOKEY MOUNTAIN GETAWAYS, LLC, MOUNTAIN GETAWAYS, LLC, JEFF EARLE, SUPERIOR VACATIONS, INC. d/b/a SUPERIOR TIMESHARE CLOSING, RAY SPIGNER, MICHAEL DEAN SPIGNER, CHARLES SIMERKA, JUDITH McGINTY, DANIEL GARRETT, and CHRISTAL FRANKLIN, | ) ) ) ) ) ) ) ) ) ) ) | |
|      Defendants. | ) | |

**MEMORANDUM**

On July 25, 2013, the plaintiffs filed an Amended Complaint for Damages (Docket No.

84). Defendants Jeff Earle and Smokey Mountain Getaways at Town Square, LLC ("SMG"),

who were added to the case in the Amended Complaint, have filed a Motion to Dismiss (Docket

No. 105), to which the plaintiffs filed a Response in opposition (Docket No. 128), and SMG filed

a Reply (Docket No. 140).[1] Defendants Michael Dean Spigner, Ray Spigner, and The Consultant

Group, Inc. (collectively, the "Spigner Defendants") have filed a Motion for Judgment on the

Pleadings (Docket No. 144), to which the plaintiffs filed a Response in opposition (Docket No.

160), and the Spigner Defendants filed a Reply (Docket No. 167). In response to the Spigner

---

[1]The caption of the case refers to SMG as "Smokey Mountain Getaways, LLC," whereas the brief refers to SMG as "Smokey Mountain Getaways at Town Square, LLC."

Defendants' Reply, Wyndham simultaneously filed a Sur-Reply (Docket No. 171) and a separate Motion to Strike the Spigner Defendants' motion (Docket No. 172), to which the Spigner Defendants filed a Response in opposition (Docket No. 177), and the plaintiffs filed a Reply (Docket No. 195). The plaintiffs have also filed a Supplemental Brief concerning damages. (Docket No. 205.)

For the reasons stated herein, the Motion to Strike will be denied, Earle and SMG's Motion to Dismiss will be granted in part and denied in part, and the Spigner Defendants' Motion for Judgment will be granted in part and denied in part.

## BACKGROUND

Michael Dean Spigner and Ray Spigner own, operate, and/or manage The Consultant Group ("TCG"), which is a Tennessee partnership. Daniel Garrett and Christal Franklin operate and/or are employees of Superior Vacations, Inc. d/b/a Superior Timeshare Closings ("Superior"), which is a Tennessee corporation. Jeff Earle operates and/or is employed by Mountain Getaways, LLC ("Mountain Getaways") and Smokey Mountain Getaways ("SMG"), both of which are Tennessee corporations. This case concerns allegations that these entities engaged in, and continue to engage in, a conspiracy that targets "Wyndham" timeshare owners and defrauds both those owners and certain "Wyndham" entities.[2]

On September 28, 2012, Wyndham Vacation Resorts, Inc. ("WVR") filed a Complaint

---

[2]The Amended Complaint and the plaintiffs' merits briefs often refer to "Wyndham" without distinguishing between the two Wyndham-related plaintiffs in this case. However, Wyndham Vacation Resorts, Inc. is defined as "Wyndham" within the Amended Complaint, and the other Wyndham-related entity, Wyndham Vacation Management, Inc., fails to state a claim for the reasons set forth herein.

against the Spigner Defendants, Superior, Charles Simerka, and Judith McGinty.[3]  On July 25, 2013, with leave of court (and over the existing defendants' objections), WVR filed an Amended Complaint (Docket No. 84), which added Daniel Garrett, Christal Franklin, Jeff Earle, Mountain Getaways, and SMG as defendants, and added Wyndham Vacation Management, Inc. ("WVM") as a party plaintiff.  (*See* Docket Nos 81 and 82 (Memorandum and associated Order granting WVR's motion for leave to amend).)  The plaintiffs have also filed a RICO Case Statement (Docket No. 26), Supplemental RICO Case Statement (Docket No. 95), a Second Supplemental RICO Case Statement (Docket No. 191), and a Third Supplemental RICO Case Statement (Docket No. 193), of which the court takes notice.

Based on its understanding of the proposed Amended Complaint allegations at the time, the court set forth the basic facts on this case in a previous opinion, familiarity with which is assumed.  (Docket No. 81.)  However, (1) the instant motions raise new and/or more focused arguments concerning the sufficiency of the Amended Complaint allegations,[4] and (2) the Spigner Defendants have introduced additional materials – properly considered at the Rule 12 stage – that place the plaintiffs' allegations in a new light with respect to some of their alleged damages.  These differences are described and addressed in the relevant sections herein.

## RULE 12(B)(6) AND RULE 12(C) STANDARDS

---

[3]Simerka and McGinty allegedly assisted the Spigner Defendants in June 2012.  Even if true, the allegations against Simerka and McGinty suggest that they played only a minor role (both substantively and temporally) in the alleged conspiracy.  Simerka is proceeding *pro se* and has not joined in either of the pending motions.  McGinty, who is represented by the same counsel as the Spigner Defendants, has not moved for dismissal of the claims against her.

[4]Earle and SMG were not parties to WVR's motion for leave to amend.  Therefore, their Rule 12(b)(6) motion reflects their first opportunity to challenge the sufficiency of the Amended Complaint as it applies to them.

A motion for judgment on the pleadings under Rule 12(c) is governed by the same standards that govern a motion to dismiss for failure to state a claim under Rule 12(b)(6). *See Reilly v. Vadlamudi*, 680 F.3d 617, 622-23 (6th Cir. 2012).

In deciding a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require that a plaintiff provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957) (quoting Fed. R. Civ. P. 8(a)(2)). The court must determine whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). To establish the "facial plausibility" as required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[threadbare] recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949-50, 173 L. Ed. 2d 868 (2009).

A court deciding a Rule 12 motion may, without converting the motion into a Rule 56

motion, consider (1) documents that a defendant attaches to a motion to dismiss, if they are referred to in the plaintiff's complaint and are central to her claim; and (2) documents that constitute public records or are otherwise appropriate for the taking of judicial notice.  *See Weiner v. Klais & Co, Inc.*, 108 F.3d 86, 89 (6th Cir. 1997); *New England Health Care Employees Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495, 501 (6th Cir. 2003).

## MOTION TO STRIKE

In its Amended Complaint, the plaintiffs repeatedly allege that the defendants caused them damage by inducing "Wyndham owners" to default on each owner's contractual obligation to pay maintenance fees "to Wyndham."  The court's ruling granting leave to amend was, in part, premised on this alleged fact.

In support of their Motion for Judgment, the Spigner Defendants attached the following documents: (1) deeds specifically referenced in the Amended Complaint; (2) Superior documents allegedly quoting putative transferors $3,000 for attorney's fees, which were referenced in the Amended Complaint; (3) an Amended and Restated Declaration of Horizontal Property Regime Covenants, Conditions and Restrictions for Fairfield Nashville at Music City USA, which was publicly recorded with the Davidson County Register of Deeds, and which is specifically referenced in one of the quitclaim deeds itemized in the Amended Complaint; (4) 10 of the 76 liens for unpaid maintenance fees recorded by the Music City USA Property Owners Association, Inc., which were publicly recorded with the Davidson County Register of Deeds; and (5) a list of the 76 liens for unpaid maintenance fees recorded by the Music City USA Property Owners Association, Inc. in the Davidson County Register of Deeds.  In support of their motion, the Spigner Defendants (correctly) argued that these materials were either referenced in the Amended

Complaint and/or were public records, thereby permitting the court to consider them at the Rule 12 stage. As described herein, these documents show that, at least in some instances, the "owners" at issue in this case contractually owed maintenance fees to *third party entities – not* to WVR.[5]

The plaintiffs filed a Response to the Motion for Judgment on the Pleadings that did not challenge the Spigner Defendants' position that considering these documents was appropriate at the Rule 12 stage. Instead, the plaintiffs attached to their Response additional documents, including (1) "Delinquency Fee Agreements" between WVR and certain trusts or timeshare owner's associations at particular facilities, and (2) purchase and sale agreements between WVR and certain timeshare owners. As discussed in more detail herein, through these documents, the plaintiffs essentially articulated a new theory of pecuniary liability that was not contained within its Amended Complaint.

After the Spigner Defendants filed a Reply that drove the hole deeper, the plaintiffs pivoted by filing the instant Motion to Strike. In the Motion to Strike, the plaintiffs argue, for the first time, that the Spigner Defendants' motion improperly relies on materials outside the Amended Complaint and, therefore, is effectively a premature Rule 56 motion.

To begin with, the plaintiffs' failure to raise this issue in its Response to the Motion for Judgment, rather than in connection with its own *Sur-Reply* (nearly three months after the motion was originally filed and more than five weeks after filing its own Response) is inexcusable and contradicts their position in the Response, which both addressed the import of the Spigner

---

[5]As explained herein, because WVM has failed to state a claim, the relevant inquiry relates to the relationship between WVR, the timeshare owners, and the relevant trusts/timeshare owners' associations.

Defendant' additional documents on the merits and introduced even more documents for the court's consideration.[6]  At any rate, on the merits, the plaintiffs simply fail to address the Spigner Defendants' valid argument that this court may consider public records and materials referenced in the Amended Complaint without converting the motion.

In sum, the plaintiffs' Motion to Strike is "a day late and a dollar short," and therefore will be denied.

## THE SPIGNER DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

### I. WVM

Although the court granted Wyndham leave to file an Amended Complaint that included WVM as a plaintiff, the Spigner Defendants convincingly argue that the Amended Complaint fails to state any claim by WVM.  The Amended Complaint states that WVM "provides services related to contractual fees, homeowners' associations, and maintenance fees for points-based products deeded to a trust."  The Amended Complaint does not otherwise reference WVM specifically, let alone (1) articulate a cause of action asserted by WVM, (2) describe the relationship between WVM and the "Wyndham owners" at issue in this lawsuit, or (3) assert that WVM suffered any damages.

In their Response, the plaintiffs provide several paragraphs of detail concerning the "Wyndham"-related business model that are not contained within the Amended Complaint.  They do not address how the court could appropriately consider that information in the Rule 12(c) context.  At any rate, subject to that purported framework, the plaintiffs argue that an unknown

---

[6]Although not specifically addressed by the parties, the purchase and sale contracts between WVR and individual timeshare purchases are arguably incorporated by reference into the Amended Complaint.

subset of WVM customers *may* have been impacted by the Spigner Defendants. The plaintiffs vaguely allege, without supporting documentation, that the defendants failed to provide (or otherwise supplement) discovery responses that would have identified any WVM customers in that category.

The court will not consider statements of counsel that are not contained within the Amended Complaint. This case was filed in September 2012, and the plaintiffs have had ample opportunity to include relevant allegations in the pleadings. Furthermore, if Wyndham had an issue with the defendants' discovery responses, it should have raised them in a Motion to Compel, not as an unsupported *post hoc* justification for (a) naming WVM as a party plaintiff without necessary contextual allegations, and (b) continuing to defend WVM's continued participation in this lawsuit.[7]

Considering the allegations within the four corners of the Amended Complaint, the court finds that the Amended Complaint does not even approach stating a cause of action by WVM. The court will therefore dismiss WVM from this case.[8] Hereinafter, the court will refer to allegations by WVR only.

## II.    Claims Specific to Dean Spigner

### A.    Breach of Duty of Loyalty

---

[7]In its July 23, 2013 opinion, the court had indicated its assumption that, if discovery showed that Wyndham's concerns relating to WVM were unfounded, Wyndham would drop WVM as a party plaintiff. Leaving aside whether the court was unnecessarily lenient in permitting WVM's addition as a party plaintiff at the time, Wyndham has not brought to the court's attention any issue pertaining to discovery relating to WVM in the intervening 10 months.

[8]Although several defendants did not join the Spigner Defendants' motion or otherwise assert the same argument concerning WVM, the grounds for dismissing WVM are the same relative to all defendants in this case.

WVR concedes that judgment on this claim (Count VIII) is warranted. The court will dismiss the claim without analysis.

## B.    Breach of Contract (Breach of Non-Compete)

### 1.    Amended Complaint Allegations

WVR alleges that Dean Spigner (hereinafter, "Spigner") violated a restrictive covenant in his "Salesperson Agreement" with WVR.[9] In relevant part, the Salesperson Agreement states that, for a period of twelve months following his termination, Spigner will not directly or on behalf of any other entity (a) solicit and/or hire (for business purposes) any current or former WVR employees or "any person who worked or provided services for WVR;" (b) solicit or persuade any WVR owner or customer to discontinue its relationship with WVR; or (c) contact for sales or marketing purposes any person whom Spigner, "as a result of [his] employment with WVR," met with or otherwise communicated with.

According to the Amended Complaint, Spigner formerly managed and/or served as a salesperson at multiple "Wyndham Resorts" over a ten-year period, including locations in Tennessee, Nevada, and Georgia. WVR alleges that Spigner "developed knowledge and information during his employment at Wyndham regarding tactics and methods he could utilize unfairly for purposes of financial gain" (Am. Compl. ¶ 92), that Spigner "developed and/or cultivated relationships with Wyndham's timeshare owners while employed at Wyndham" (*id.* ¶

---

[9]WVR filed a copy of Spigner's Salesperson Agreement as an exhibit to its *proposed* Amended Complaint. After this court granted leave to amend, WVR filed an Amended Complaint that contained references to, but did not actually attach, any of the referenced exhibits. This was presumably an oversight by WVR's counsel. Regardless, the parties have treated the Salesperson Agreement – in the form introduced as a proposed exhibit – as incorporated by reference into the Amended Complaint.

95), and that "Spigner's interaction with and service to his Wyndham customers, while employed at Wyndham, was a vital aspect in furthering the business interests, goodwill and reputation of Wyndham." (*Id.* ¶ 98.) The Amended Complaint does not elaborate on the types of "knowledge or information" or "relationships" that Spigner allegedly developed through his employment at WVR. However, in the Salesperson Agreement itself, Spigner explicitly acknowledged that, "as an employee of WVR, *Salesperson may be given or be privy to certain valuable, proprietary or confidential information*, including but not limited to sales, marketing, and training materials and information, [p]roduct pricing and strategies, and prospect or purchaser lists." (Salesperson Agreement ¶ 6 (emphasis added).)

On June 3, 2012, Spigner, who, at that time, was working at the Wyndham Plantation in Villa Rica, Georgia, voluntarily quit WVR. According to the Amended Complaint, Spigner immediately (1) set up a competing business, TCG, at the Villa Rica facility; (2) set up a booth with "Wyndham" logos that gave customers the initial false impression that his company's sales pitch was affiliated with WVR;[10] (3) through a deceptive "hard sell" sales presentation, solicited and persuaded WVR customers to transfer their timeshare interests and to purchase a substitute vacation package instead,[11] (4) hired former WVR employees Amanda Farmer and Karen Roque, and hired or attempted to hire former WVR employee Simerka, as TCG employees; and (5)

---

[10]According to the Amended Complaint: "Consultant Group employees provided individuals with the impression that they are employees of or associated with Wyndham through the use of the following deceptive practices: the presence of a Wyndham sign or banner; the presence of Wyndham napkins; and the use of an individual wearing Wyndham clothing and driving a vehicle marked as a Wyndham vehicle to meet with Wyndham owners." (Am. Compl. ¶ 62.)

[11]Although it is not perfectly clear in the Amended Complaint, it appears that TCG marketed a Mountain Getaways vacation package as the substitute for WVR's packages. According to the Amended Complaint, Earle and/or SMG received a cut of these sales.

utilized (then) current WVR employee McGinty to solicit customers away from WVR in June 2012. Spigner allegedly continued to contact WVR owners and to solicit their business through deceptive practices for the next 12 months.

Assuming these allegations to be true, Spigner flagrantly violated the terms of his non-compete agreement in multiple respects. Nevertheless, Spigner argues that, under Tennessee law, (1) WVR has not pleaded sufficient facts to establish that WVR had a legitimate business interest to protect through the non-compete clause in the first place; and (2) even if WVR had such an interest, the non-compete clause's terms are overbroad.[12]

In *Murfreesboro Med. Clinic, P.A. v. Udom*, 166 S.W.3d 674, 678 (Tenn. 2005), the Tennessee Supreme Court set forth the following standards for evaluating covenants not to compete:

> In general, covenants not to compete are disfavored in Tennessee. These covenants are viewed as a restraint of trade, and as such, are construed strictly in favor of the employee. However, if there is a legitimate business interest to be protected and the time and territorial limitations are reasonable then non-compete agreements are enforceable. Factors relevant to whether a covenant is reasonable include: (1) the consideration supporting the covenant; (2) the threatened danger to the employer in the absence of the covenant; (3) the economic hardship imposed on the employee by the covenant; and (4) whether the covenant is

---

[12]Paragraph 14 of the Salesperson Agreement, which is dated August 29, 2011, states that the agreement "shall be construed according to the laws of the State in which Salesperson [*i.e.*, Spigner] was last employed by FRI [Fairfield Resorts, Inc.]" Here, the parties appear to assume that Tennessee law governs Spigner's agreement, although no party references ¶ 14 and no party represents that Spigner was last employed by Fairfield Resorts, Inc. – whatever that entity may be – in Tennessee. The court will assume for purposes of the motion, as the parties have, that Tennessee law governs Spigner's Salesperson Agreement.

Also, with respect to the section relating to WVR's breach of contract claim against Spigner, the court is somewhat surprised with WVR's brief, which at times cites allegations that do not support the proposition for which they are cited. WVR should assume that the court always cross-checks references for accuracy.

inimical to the public interest.  Also, the time and territorial limits must be no greater than necessary to protect the business interest of the employer.

*Id.* (internal citations omitted).  In determining whether there is a "legitimate interest to be protected," Tennessee applies the following framework:

Because an employer may not restrain ordinary competition, it must show the existence of special facts over and above ordinary competition.  These facts must be such that without the covenant, the employee would gain an unfair advantage in future competition with the employer.  Considerations in determining whether an employee would have such an unfair advantage include (1) whether the employer provided the employee with specialized training; (2) whether the employee is given access to trade or business secrets or other confidential information; and (3) whether the employer's customers tend to associate the employer's business with the employee due to the employee's repeated contacts with the customers on behalf of the employer.  These considerations may operate individually or in tandem to give rise to a properly protectable business interest.

*Vantage Tech., LLC v. Cross*, 17 S.W.3d 637, 644 (Tenn. Ct. App. 1999) (internal citations omitted).

Here, construing the terms of the Amended Complaint liberally and drawing all reasonable inferences in favor of WVR, the court finds that WVR has pleaded facts sufficient to show that WVR had a legitimate business interest to protect through the non-compete agreement. Spigner's actions were precisely the types of activities that the non-compete agreement was designed to prevent.  In the Salesperson Agreement itself, Spigner acknowledged that he would become privy to several categories of highly sensitive and/or confidential business information, and the Amended Complaint alleges that he utilized WVR's "confidential information" to his own advantage during the 12-month post-termination period.  Spigner targeted WVR owners at the same facility he had *just* managed, and he immediately recruited WVR personnel (including his own son) to work for him.  Assuming that the Amended Complaint allegations are true, it is reasonable to infer that Spigner was capitalizing on some type of confidential WVR information

in operating the new venture in direct competition with WVR.[13]

As to Spigner's argument that the non-compete terms were broader than necessary, the court finds that, in the context of this case, the issue is fact-dependent and should be addressed at a later stage. The time limitation of 12 months is not *per se* unreasonable. *See Dabora, Inc. v. Kline*, 884 S.W.2d 475, 478 (Tenn. Ct. App. 1994) (upholding three-year nationwide restrictive covenant). Furthermore, given the breadth of WVR's operations nationwide and Spigner's sales activity in multiple states, it may be that the nationwide scope of the non-compete was justified for that 12-month period. *See, e.g.*, *id.*; *William v. Tanner Co., Inc. v. Taylor*, 530 S.W.2d 517 (Tenn. Ct. App. 1974) (upholding two-year nationwide restrictive covenant). The reasonableness of these restrictions may turn on the scope of WVR's legitimate business interests generally and facts specific to Spigner specifically. Accordingly, the court finds that judgment on the breach of contract claim against Spigner is not warranted at this stage.

## III. Damages

The Spigner Defendants contend that WVR has suffered no damages because WVR is not owed maintenance fees. As an initial matter, as WVR points out in its in brief, it seeks more than pecuniary damages for the loss of maintenance fees. Among those additional claimed damages are "[d]amages related to the loss of goodwill" and damages to WVR's "reputation," the "loss of future profits and future business" from the loss of repeat business, referrals, and upgrades by existing WVR owners, and "costs, losses and fees related to the substantial resources needed to

---

[13]Of course, whether WVR will be able to show that Spigner in fact acquired "confidential" information, received "specialized" training, or otherwise became the "face" of WVR to certain segments of WVR's customer base, are separate questions that are best addressed on a developed factual record.

address" the consequences of the defendants' actions. As a general matter, these are potentially cognizable losses.[14]  The key issue raised by the Spigner Defendants relates to one other category of damages: whether WVR "lost" any maintenance fees because of the fraudulent transfers and can legally recover for those losses.

The Spigner Defendants have introduced documents that appear to cast considerable doubt on WVR's lost maintenance fees theory of damages.  For example, units at the Fairfield Nashville at Music City USA Resort, which changed its name to "Wyndham" in 2006, are governed by a Declaration of Covenants, Conditions, and Restrictions ("Restrictions") establishing "The Music City Property Owners, Association, Inc."  That association manages the resort and charges its members/timeshare owners fees for management of the timeshare program and maintenance of the units.  The association is owed the fees, the association has the right to charge late fees and interest, and the association has the right to record liens and to foreclose on an owner's interest in the event of default on payment of the maintenance fees.  Public records introduced by the Spigner Defendants show that the association has, in fact, recorded liens for unpaid maintenance fees.

In its Response, WVR does not dispute that it is not directly owed maintenance fees as to certain timeshare interests at issue in this lawsuit.  However, WVR has produced copies of an "Assignment Agreement and Use Restriction" and/or a "Purchase and Sale Agreement" it executes with customers at the point of sale.  These agreements include a promise to pay maintenance fees to the relevant timeshare owners' association or trust.  For example, one

---

[14]It may be that some classes of damages are available for certain claims by WVR but not others. Because the parties have not addressed the issue, the court makes no express findings concerning the availability of these alleged losses relative to particular claims.

Assignment Agreement states as follows: "Owner hereby agrees to pay to the Trust on behalf of the Association an annual [assessment] for certain expenses attributable to the Plan in accordance with the provisions of the Trust Agreement, . . . which annual [a]ssessment includes Owner's share of the expenses associated with the operation and maintenance of the Plan, . . . and may include Owner's proportionate share of Owner's POA maintenance fees and common expenses attributable to his Property[.]" That Assignment Agreement also provides that, "[i]n the event Owner defaults on his obligation under the Contract resulting in the termination of said Contract, this Assignment Agreement shall be deemed terminated and cancelled and all rights of the Owner hereunder shall cease." (¶ 15.) These terms appear to obligate an owner to pay those expenses to a homeowner's association (or trust) as a condition of the purchase and sale agreement/assignment agreement between WVR and a particular owner.[15]

WVR contends that it is damaged by the failure of timeshare owners (or the sham transferees) to pay maintenance fees to the homeowners' associations because WVR has a separate contractual relationship with those associations, whereby it pays the associations somewhere between 75% and 100% of the value of aggregate delinquencies. As an initial matter, this contractual relationship is not alleged in the Amended Complaint. More importantly, the Spigner Defendants argue that the agreements appear to be voluntary contracts between WVR and the associations, whereby WVR actually *profits* by receiving the right to re-sell the spaces corresponding to the delinquent homeowners. WVR contends that it is a so-called "lost volume" seller and that, under Tennessee law, its efforts to mitigate damages and to keep the homeowners'

---

[15]Although neither party here characterizes it as such, it appears that the homeowner's association may be a third-party beneficiary under these agreements.

associations solvent (as it characterizes the delinquency fee agreements) do not preclude it from claiming breach of contract and/or from claiming damages for the lost maintenance fees.

The Spigner Defendants have made a cogent argument that WVR is not entitled to recover the unpaid maintenance fees because WVR was not entitled to those fees in the first place. Nevertheless, the court finds that it would be premature to render a partial judgment at this stage relating to this category of claimed pecuniary damages by WVR. First, the relationships among WVR, timeshare owners, and the timeshare owners' associations are, in a word, complicated. While it may be that WVR cannot recover those fees based on a separate, voluntary contract between itself and a particular association, the issue requires more context and explanation than the Rule 12 restrictions afford. Second, the record before the court on this issue is incomplete; indeed, WVR argues that, in some instances, it does have contracts under which timeshare owners owe WVR the maintenance fees directly. Thus, even if it were appropriate for the court to draw conclusions regarding the Music City USA Restrictions, it is not clear that extrapolating those conclusions to all of the timeshare interests at issue in this lawsuit would be appropriate. Under the circumstances, the court will not dismiss WVR's pecuniary damages at this stage, although the court is now cognizant that, relative to timeshare interests at certain facilities corresponding to some (likely most) of the timeshare interests at issue in this case, WVR may have an uphill climb to show that it is legally entitled to those damages.[16]

## IV.    <u>Other Claims</u>[17]

---

[16]The court reserves judgment on whether WVR may even recover under this alternative theory of damages, which was not set forth in the Amended Complaint.

[17]The court observes that the Spigner Defendants answered the original Complaint, which asserted the foregoing claims against them. The Spigner Defendants now contend that the Amended Complaint, which actually contains more detailed allegations than the Complaint, is

## A.   Intentional Interference with Current and/or Prospective Business Relations, and Interference with Contractual Relations

To show intentional interference with business relations, a plaintiff must show: (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means; and (5) damages resulting from the tortious interference. *Trau-Med of Am. Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002). The Spigner Defendants argue that WVR has not alleged a business relationship with the timeshare owners or the termination of a business relationship, arguments that are essentially flip-sides of the same coin.

WVR apparently entered into agreements with some customers that were conditioned on the customer's continued payment of maintenance fees to a timeshare owner's association. WVR also alleges that some of its business comes from upgrades and other packages that existing

---

insufficient to state the additional claims discussed in this section against them.

The court also notes that WVR continues to cite *WVR v. VP Transfers, LLC*, 2013 WL 4510954 (M.D. Tenn. Aug. 27, 2013), in which another judge within this district granted an *unopposed* Motion for Summary Judgment in a somewhat similar case. Given that the motion was unopposed, the sufficiency of the claims at issue in *VP Transfers* went unchallenged, thereby reducing the persuasive value of the legal conclusions reached by the court in that case significantly. Finally, WVR at times cites indiscriminately to cases in other jurisdictions involving timeshare "consultants," without explaining how the factual circumstances in those cases are analogous to those presented here (indeed, at least in some instances, they are not) and what inferences the court should draw from the fact that claims have been filed and/or settled in other jurisdictions without a finding or admission of liability. In the absence of any meaningful attempt to address the relevance of those cases to this lawsuit, the court has not relied on them in any fashion in addressing the instant motions.

WVR timeshare owners purchase from WVR.  The alleged conspiracy was designed to facilitate fraudulent transactions that inevitably resulted in 1) the transferor ceasing to pay maintenance fees (to whomever those fees were owed directly), (2) the transferor not continuing to do any business with WVR related to that timeshare interest, such as purchasing upgrades, and (3) the transferee (always a judgment-proof sham purchaser, sometimes without knowledge) not paying maintenance fees, with no prospect of doing future business with WVR related to that timeshare interest.

In an argument that only a lawyer could love, the Spigner Defendants also argue that, if WVR is correct that the fraudulent conveyances that the Spigner Defendants procured are legally void, then the business relationship between WVR and the (none-the-wiser) transferors never actually terminated in the first place, meaning that WVR should be suing the innocent transferors. The Spigner Defendants cite no legal authority for the proposition that a *de facto* termination of the business relationship between WVR and the transferor – which the Spigner Defendants precipitated – falls outside the *Trau-Med* formulation.  Moreover, the Amended Complaint alleges that Spigner/TCG's sales pitch specifically touted TCG's ability to assist customers in terminating their continued relationship with WVR in favor an alternative vacation club package (the Mountain Getaways package, apparently) that purportedly would offer the same benefits at lower cost.  In other words, the Spigner Defendants' business model allegedly was premised on drawing customers away from WVR, or at least convincing customers that the deed transfers and purchase of a substitute Mountain Getaways package would accomplish that result. Accordingly, the court finds that WVR has sufficiently alleged a business relationship with existing third parties and has sufficiently alleged that the Spigner Defendants sought to interfere with or

terminate that relationship (or the prospect of a continuing relationship). The court therefore will

not dismiss the claim for interference with business relations against the Spigner Defendants.

To show tortious interference with the performance of a contract (also referred to as

"procurement of the breach of a contract"), a plaintiff must show (1) that there was a legal

contract; (2) that the defendant knew of the existence of the contract; (3) that the defendant

intended to induce a breach of the contract; (4) that the defendant acted maliciously; (5) that the

contract was actually breached; (6) that the defendant's acts were the proximate cause of the

breach; and (7) that the plaintiff suffered damages resulting from the breach. *See Polk &*

*Sullivan, Inc. v. United Cities Gas Co.*, 783 S.W.2d 528, 543 (Tenn. 1989) (citing *Dynamic Hotel*

*Mgmt., Inc. v. Erwin*, 528 S.W.2d 819, 822 (Tenn. Ct. App. 1975)).[18] "Interference with an

existing contract is without justification if it is done for the indirect purpose of injuring the

plaintiff or benefiting the defendant at the plaintiff's expense." *Freeman Mgmt. Corp. v.*

*Shurgard Storage Ctrs., LLC*, 461 F. Supp. 2d 629 (M.D. Tenn. 2006) (brackets omitted)

(quoting *Crye-Leike Realtors, Inc. v. WDM, Inc.*, 1998 WL 651623, at *6 (Tenn. Ct. App. Sept.

24, 1998)).

Here, the Spigner Defendants argue that WVR cannot maintain an action for procurement

of breach of contract because WVR did not have a direct contractual relationship with timeshare

owners relating to maintenance fees. The Spigner Defendants' position appears to be premised

---

[18]"Tennessee recognizes both a common law and statutory action based on unlawful inducement of breach of contract." *Carruthers Ready-Mix v. Cement Masons Local Union No. 520*, 779 F.2d 320, 323 (6th Cir. 1985) (citing Tenn. Code Ann. § 47-50-109). Both causes of action have the same seven elements. *Carruthers*, 79 F.2d at 323. The court also notes that some cases characterize the causes of action as having five elements, although this "five" element test appears to incorporate the same requirements as the seven-factor test.

on two assumptions: (1) the maintenance fee obligation is the only basis for WVR's tortious procurement claim, and (2) WVR did not attach agreements to the Amended Complaint showing a direct relationship with timeshare owners and did not produce any such agreements *in discovery,* "for a reason:" namely, that no such agreements exist.  The court rejects the first premise, which ignores the other damages claimed by WVR.  The court also finds that it is premature to address the second premise, which essentially asks the court to weigh the evidence (or lack thereof) for a particular allegation.  Indeed, WVR has filed agreements reflecting contracts with WVR related in part to maintenance fee payments, which the Spigner Defendants arguably persuaded timeshare owners to breach.[19]  For both of these reasons, the court finds that judgment on the tortious procurement claims, as pleaded, would be premature.

## B.     Fraud

To establish a claim for fraud, a plaintiff must show: (1) the defendant made a representation of an existing or past fact; (2) the representation was false when made; (3) the representation was in regard to a material fact; (4) the false representation was made either knowingly or without belief in its truth or recklessly; (5) plaintiff reasonably relied on the misrepresented fact; and (6) plaintiff suffered damage as a result of the misrepresentation.  *PNC Multifamily Capital Institutional XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp.*, 387 S.W.3d 525, 548 (Tenn. Ct. App. 2012).  Unlike WVR's RICO cause of action (addressed herein), its fraud claims necessarily relate to fraudulent misrepresentations made directly to WVR.

---

[19]Again, the court expresses no opinion as to whether breach of a term in contracts between WVR and timeshare owners that references payments to a third-party (the homeowners' association) constitutes a breach for which WVR may legally recover.  That issue will be best addressed on a developed record.

Although the Amended Complaint identifies fraudulent statements allegedly made by the Spigner Defendants to the timeshare owners themselves, the Amended Complaint does not identify any allegedly fraudulent statements made by the Spigner Defendants *to WVR*, let alone how WVR relied on those statements. WVR's response essentially attempts to fudge this distinction by pointing out that Count III (the fraud claim) incorporates various misrepresentations alleged elsewhere in the Amended Complaint. While that is true, WVR does not explain how those misrepresentations square with the relevant factors under Tennessee law; indeed, the referenced misrepresentations by the Spigner Defendants were made to timeshare *owners*, not WVR. The gravamen of Count III concerns conduct by Superior (along with Garrett and Franklin) for knowingly submitting fraudulent transfer documentation to WVR, on which WVR relied. Accordingly, although the Amended Complaint allegations show that the Spigner Defendants may have defrauded *the owners*, the court finds that WVR has not adequately alleged that the Spigner Defendants (as opposed Superior, *et al.*) defrauded *WVR* for purposes of a Tennessee common law fraud claim.[20]

**C.     RICO**

1.     Elements of RICO Claims Under § 1962(c) and (d)

The Amended Complaint asserts claims under 18 U.S.C. § 1962(c) and § 1962(d).

---

[20]The court need not reach the Spigner Defendants' arguments concerning whether the transfer documentation submitted by Superior to WVR actually contained any misrepresentations and/or whether WVR reasonably relied on the alleged misrepresentations. Although it has no bearing on the instant motions, the court does note that WVR's Third Supplemental RICO Statement and its Motion for Preliminary Injunction attach documents that strongly suggest that Superior was forging signatures, falsely notarizing signatures, and processing deed transfers to purported transferees (Howard Hamilton, for one) who had no knowledge of the transactions.

Section 1962(c) makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." *Wallace v. Midwest Fin. & Mortg. Servs., Inc.*, 714 F.3d 414 (6th Cir. 2013) (quoting 18 U.S.C. § 1962(c)). To show a claim under § 1962(c), a plaintiff must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Wallace*, 714 F.3d at 422 (quoting *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985)). "To plausibly state a claim for a violation of [] § 1962(d), plaintiffs must successfully allege all the elements of a RICO violation, as well as alleg[e] the existence of an illicit agreement to violate the substantive RICO provision." *Heinrich v .Waiting Angels Adoption Servs. Inc.*, 668 F.3d 393, 411 (6th Cir. 2012) (internal quotation omitted). "An agreement can be shown if the defendant objectively manifested an agreement to participate directly or indirectly in the affairs of an enterprise through the commission of two or more predicate crimes." *Id.*

A "pattern of racketeering activity" requires at least two predicate acts of racketeering activity. *Id.* § 1961(5). To show a pattern, the racketeering predicate acts must be related and must pose a threat of continued criminal activity. *Brown v. Cassens Transp.*, 546 F.3d 347, 354 (6th Cir. 2008). A relationship among predicate acts is established when they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* Mail fraud (18 U.S.C. § 1341) and/or wire fraud (18 U.S.C. § 1343) are federal offenses that can constitute predicate offenses for a civil RICO claim. *See* 18 U.S.C. § 1961(1); *In re ClassicStar Mare*

*Lease Litig*, 727 F.3d 473, 487 (6th Cir. 2013).

Mail fraud consists of "(1) a scheme to defraud, and (2) use of the mails in furtherance of the scheme." *Heinrich*, 668 F.3d at 404. "The elements of wire fraud are essentially the same except that one must use the wires in furtherance of the scheme to defraud." *Id.* "A scheme to defraud includes any plan or course of action by which someone else uses false, deceptive, or fraudulent pretenses, representations, or promises to deprive someone else of money," to part with property, and/or "to surrender some legal right, and which accomplishes the end designed." *Id.*; *Riverview Health Inst. LLC v. Med. Mutual of Ohio*, 601 F.3d 5050, 513 (6th Cir. 2010). "Because RICO claims require proof of mail or wire fraud as an element, the plaintiffs must also satisfy the heightened particularity requirements of [Rule 9(b)] with respect to the elements of fraud." *Jackson v. Sedgwick Claims Mgmt. Servs., Inc.*, 699 F.3d 466, 476 (6th Cir. 2012).

A plaintiff must also establish *scienter* to establish a scheme to defraud, which is satisfied by showing that the defendant acted either with a specific intent to defraud or with recklessness with respect to potentially misleading information. *Heinrich*, 668 F.3d at 404.

Although a plaintiff must establish proximate cause between the injury asserted and the injurious conduct alleged, a plaintiff asserting a RICO claim predicated on mail fraud need not show that it relied on the defendant's alleged misrepresentation. *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 661 (2008); *ClassicStar*, 727 F.3d at 487. For pleading purposes, it is sufficient to plead that a defendant's fraud was a "substantial and foreseeable cause" of the injuries alleged by the plaintiff and that the relationship between the wrongful conduct and the injury is "logical and not speculative." *ClassicStar*, 727 F.3d at 487.

2. Mail or Wire Fraud

In its Memorandum granting leave to amend, the court previously addressed the sufficiency of the mail and wire fraud allegations against the Spigner Defendants, and the court finds no reason to revisit its conclusions here. Briefly, the Spigner Defendants contend that the Amended Complaint does not satisfy the requirements of Rule 9(b). However, the Amended Complaint (and the associated RICO Case Statements) identify numerous specific instances in which the Spigner Defendants allegedly (1) quoted certain individuals $3,000 for a "lawyer" to handle their outstanding payment obligations, with knowledge that no lawyer would actually be involved, and electronically communicated that misrepresentation to Superior for processing; (2) falsely gave the impression they were affiliated with WVR, made misrepresentations about the nature of the Wyndham timeshare assets to induce owners to seek to transfer them, signed documents as "authorized agents" of Superior in procuring customers, and transmitted those documents to Superior through the mail and/or electronically with the knowledge and understanding (not conveyed to the transferor) that Superior would not actually process a legitimate transfer to a *bona fide* third-party purchaser. The Amended Complaint states the dates of these mail and/electronic communications in furtherance of the alleged conspiracy, which, combined with the other allegations in the Amended Complaint, are sufficient to satisfy the Rule 9(b) particularity requirements.[21]

### D. TCPA

Under the TCPA, "any person who suffers an ascertainable loss of money or property,

---

[21]Herein, the court also analyzes the claims by Earle and SMG that the plaintiffs have failed to plead predicate acts of mail and/or wire fraud with adequate particularity. The additional legal authority cited therein regarding the type of showing required to link predicate acts of mail and/or wire fraud to an overarching RICO conspiracy applies with equal force to the predicate acts of mail and wire fraud alleged against the Spigner Defendants

real, personal, or mixed, or any other article, commodity, or thing of value wherever situated, as a result of the use or employment by another person of an unfair or deceptive practice described in § 47-18-104(b) and declared to be unlawful by this part, may bring an action individually to recover actual damages." Therefore, to maintain a private cause of action under the TCPA, a plaintiff must allege a violation of one of the acts specifically enumerated in Tenn. Code Ann. § 47-18-104(a).[22] The court previously held that the (then-proposed) Amended Complaint sufficiently stated a TCPA claim against several defendants.

As the court previously found, the alleged conduct by the Spigner Defendants plausibly falls within one or more enumerated practices under § 104(b). *See, e.g.*, Tenn. Code Ann. §§ 105(b)(5) ("[r]epresenting that goods or services have . . . characteristics . . . that they do not have . . . ."), (b)(8) ("[d]isparaging the goods, services, or businesses of another by false or misleading representations of fact"), and (b)(12) ("Representing that a consumer transaction confers or involves rights, remedies or obligations that it does not have or involve or which are prohibited by law."). For example, WVR alleges that the Spigner Defendants falsely charged certain timeshare owners (apparently those whose interest in the timeshare had not been fully paid to WVR) $3,000 to enlist an attorney's help, despite knowing that no attorney would be involved. Similarly, WVR alleges that the Spigner Defendants intentionally utilized "Wyndham" branding to solicit customers at the Villa Rica, Georgia facility, thereby creating the false impression (at

---

[22]Although the TCPA contains a "catch-all" provision for "engaging in any other act or practice which is deceptive to the consumer or to any other person," that specific provision is enforceable only by the Tennessee Attorney General's office. Tenn. Code Ann. § 47-18-104(b)(27). Thus, § 104(b)(27) does not confer a private cause of action for unfair or deceptive practices that do not fit within one of the specific acts or practices enumerated in § 104(b). *See Brewer v. Kitchen Designs & Cabinetry*, 2013 WL 14000618, at *7 n.11 (Tenn. Ct. App. Apr. 3, 2013).

least initially) of an affiliation with WVR in order to attract clients. WVR also alleges that the Spigner Defendants convinced timeshare owners that they would facilitate legally binding deed transfers, despite knowing that the conveyance would in fact be fraudulent and, therefore, not legally binding.

The Spigner Defendants also argue that WVR does not have standing to assert TCPA claims because WVR is not a "consumer" with respect to the transactions issue. Among other forms of relief, the TCPA provides that "*anyone affected by a violation of this part* may bring an action to obtain a declaratory judgment that the act or practice violates this part and to enjoin the person who has violated, is violating, or who is otherwise likely to violate this part[.]" Tenn. Code. Ann. § 47-18-109(b) (emphasis added). As noted above, the TCPA affords an individual right of action to "*any person* who suffers an ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated, as a result of the use or employment by another person of an unfair or deceptive practice described in § 47-18-104(b) . . . ." *Id.* § 47-18-104. A "person" is defined as "a natural person, . . . corporation, trust estate, . . . and any other legal or commercial entity however organized." *Id.* § 47-18-103(13). Thus, the statute provides that corporations can have standing to bring claims under the TCPA. *See Affinion Benefits Grp., LLC v. Econ-O-Check Corp.*, 784 F. Supp. 2d 855, 879 (M.D. Tenn. 2011) (citing *ATS Se., Inc. v. Carrier Corp.*, 18 S.W.3d 626, 630 (Tenn. 2000)). The TCPA states that it "shall be liberally construed . . . to protect consumers and legitimate business enterprises from those who engage in unfair or deceptive acts or practices in the conduct of any trade or commerce in part or wholly within this state." Tenn. Code Ann. § 47-18-102(2).

Here, the Spigner Defendants rely on *Wagner v. Fleming*, 139 S.W.3d 295 (Tenn. Ct.

App. 2004), which had a peculiar set of facts.  In *Wagner*, the plaintiff sought to sell his house at auction, cognizant of an ongoing public policy debate about whether an energy company might exercise eminent domain over property in the area as part of a new project.  On the date of the auction, the plaintiffs' neighbor and the neighbor's colleague, both of whom were affiliated with an organization that opposed the energy company's project, placed signs on the access road to both properties (the neighbor's and the plaintiff's) stating something to the effect of, "Don't let the company take my land by eminent domain."  For that and several other reasons, the plaintiff received lower bids than he had expected at the auction of his property, after which he sued the neighbor and the neighbor's friend under the TCPA.  On appeal, the Tennessee Supreme Court analyzed TCPA § 102(2), which states that the TCPA should be liberally construed to protect "consumers and legitimate business enterprises."  Presumably because all of the parties to *Wagner* were individuals and the case involved a real estate transaction, the court focused only on the term "consumer," which is defined to include only a "natural person who," among other things, "seeks or acquires by purchase, rent, lease, [or] assignment . . . any goods, services, or property . . . ."  Under a straightforward application of the statutory language, the court found that the plaintiff was not a "consumer" as the term was utilized in § 102(2), because the *plaintiff* in the case had not sought to acquire or purchase the real estate at issue; in fact, it was the other way around – the plaintiff was seeking to sell it.

     *Wagner* sheds little light on the issue presented here, because it did not address the construction of the term "legitimate business enterprise" within § 102(2), which is not otherwise

defined in the statute.[23]  Indeed, § 102(2) says that the statute protects consumers *and* legitimate

business enterprises: here, the Spigner Defendants have not explained why the court should read

the definition of "consumer" (a natural person) into the separate term "legitimate business

enterprise."

Furthermore, many of the enumerated deceptive business practices in TCPA § 104 apply

more naturally to an entity "affected . . . as a result of" the deceptive practice (§ 109(a)(1)), even

where the affected entity was not a "consumer" with respect to the transaction at issue.  For

example, § 104(8) makes it unlawful to "[d]isparag[e] the goods, service or business of another

by false or misleading representations of fact."  Presumably, where Business A disparages

Business B in an effort to procure a relationship with a potential customer, the more natural

plaintiff in a TCPA action would be *Business B*, not the consumer herself, who presumably could

care less about whether Business A is disparaging Business B and, therefore, has no inherent

incentive to file suit to protect Business B.  If Business B sued Business A under this hypothetical

scenario, it would be consistent with the TCPA's statutory purpose to protect "legitimate business

enterprises" (§ 102(2)) and the definition of a "person" in § 103(13) to include a "corporation" as

an entity entitled to bring suit.  It would also be consistent with the TCPA's intent to protect that

business from deceptive disparagement by another person (or business) (*see* § 103(8)) and the

TCPA's broad grant of a cause of action to any business that is "affected" "as a result of" that

deceptive and unlawful practice (*see* § 109(a)(1)).  The court is therefore persuaded that, under

---

[23]At least one scholar has endorsed the notion that the TCPA and other similar statutes should only apply to corporations (or businesses) that are acting as "consumers" with respect to the transactions at issue.  *See* Bryant, Kenneth J., *The Tennessee Consumer Protection Act and Business Standing to Sue: "Acting in a Consumer-Oriented Manner."*  35-SEP Tenn. B. J. 13, 16-18 (1999) (collecting and summarizing cases).

appropriate circumstances, the TCPA countenances claims by corporations against defendants alleged to have engaged in unlawful business practices, even where the unlawful practices by a defendant were directed at third parties – here, the timeshare owners – rather than at that corporation.

Based on these considerations, the court is not persuaded by the Spigner Defendants' position that WVR's cause of action must fail at the Rule 12 stage because WVR was not a "consumer" with respect to the Spigner Defendants. Although there may be other reasons why WVR's claims against the Spigner Defendants under the TCPA may be limited (or fail) based on the facts of the case, that is an issue for another day.

###        E.        Conspiracy

The Spigner Defendants have not specifically addressed the conspiracy claims against them. At any rate, having found that several underlying causes of action will proceed, the court finds that the conspiracy claims against the Spigner Defendants will also proceed.

## V.        Summary

The Spigner Defendants' Motion for Judgment will be granted in part and denied in part. All claims by WVM against all defendants will be dismissed. WVR's claim against Dean Spigner for breach of duty of loyalty (Claim VIII) and WVR's fraud claims against the Spigner Defendants will be dismissed. The remaining claims against one or more of the Spigner Defendants will proceed.

## SMG'S MOTION TO DISMISS

## I.        Claims at Issue

WVR asserts claims against Earle and SMG for violations of RICO (Claims I and II),

common law fraud (Claim III), tortious interference with business and/or contractual relations (Claims IV and VI), procurement of breach of contract (Claim VII), violations of the TCPA (Claim IX), and civil conspiracy (Claim X).[24]

## II.      Dispute Concerning Delay

Earle and SMG argue that WVR untimely delayed in adding them to the lawsuit.  They argue that, based on that delay, the court should infer that WVR's claims are unfounded.  Based on the chronology of events identified by WVR – including difficulties relating to service and/or attempted service of subpoenas on Earle and SMG, and ongoing discovery regarding the relationship among Earle/SMG/Mountain Getaways, the Spigner Defendants, and Superior, the court finds no indication of an untimely delay.  Moreover, WVR filed the Rule 15 motion to add Earle and SMG within the Rule 15 deadline set forth in the Case Management Order.  The timing of Earle and SMG's addition as defendants therefore plays no role in the court's analysis.

## III.     Specific Claims

### A.      RICO

Earle and SMG argue that the RICO claims must fail because the plaintiffs have not alleged that (1) Earle or SMG engaged in "any improper act under the federal RICO law" vis-a-vis Wyndham, (2) Earle or SMG engaged in any actions that caused Wyndham damage, and (3) Earle or SMG had the requisite knowledge of illegal activity by Superior.

####         1.      Predicate Acts

Earle and SMG's first position is without merit for multiple reasons.  First, Earle and

---

[24]Earle and SMG purported to seek dismissal of the remaining counts.  As WVR has pointed out, WVR did not assert those claims against Earle and SMG in the first place.

SMG appear to assume that they cannot have committed mail fraud unless they themselves transmitted a fraudulent communication by mail or wire. However, the offense of mail fraud requires only "a scheme to defraud, the mailing of a letter for the purpose of executing the scheme and proof that the defendant caused the mailing." *United States v. Wuliger*, 981 F.2d 1497, 1504 (6th Cir. 1992). Within the Sixth Circuit, an individual "causes" a mailing where "1) one acts with knowledge that use of the mails will follow, or 2) where such use can *reasonably be foreseen*, even though not actually intended." *Id.* (emphasis in original); *see also Pereira v. United States*, 347 U.S. 1, 8-0 (1954). Indeed, "[i]t is not necessary that the scheme contemplate the use of the mails as an essential element." *Pereira*, 347 U.S. at 8-9 ("Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used.").

Here, the allegations, if true, show that Earle and SMG targeted and accosted Wyndham owners, convinced them to transfer those assets and to pay up-front fees to Earle and/or SMG, and made false representations to Wyndham owners that a legitimate third party would purchase the deeds with assistance from Superior. Earle and SMG purported to execute agreements with customers as "authorized representatives" of Superior, agreements that Earle and/or SMG transmitted by mail and/or electronically to Superior. According to the Amended Complaint, Earle and SMG knew that there was no *bona fide* third-party purchaser and that Superior would instead fabricate a fraudulent conveyance to a sham purchaser, who would inevitably default on the deed-related obligations. The entire scheme is premised on the assumption that Superior could transmit the fraudulent conveyance documents to WVR's's property group without raising

any red flags.  As alleged, this integrated operation constitutes a scheme to defraud both the

consumers and Wyndham, and the scheme includes – and indeed requires – the use of mail

and/wire communications (between Earle/SMG and Superior in the first instance, and between

Superior and Wyndham in the second instance) to operate successfully.  Construing the

allegations in the light most favorable to the plaintiffs, Earle and SMG "caused" the mailings

and/or electronic communications because they knew or reasonably foresaw that use of the mail

or wires would occur.[25]

The Amended Complaint contains numerous examples of fraudulent deed transfers that

SMG and/or Earle facilitated.  For example, on February 19, 2012, presumably acting as an

"authorized representative" of Superior, SMG executed a "Superior" contract for Earl and Francis

Turner.  SMG transmitted that paperwork to Superior.  On March 3, 2012 and July 17, 2012,

Superior in turn submitted fraudulent transfer documentation to Wyndham.  As would be

expected given the other allegations in the Amended Complaint, the account corresponding to the

transferee is now in default.  Similarly, on December 12, 2010, SMG executed a "Superior"

contract with Kenneth Moffett, quoted him up-front fees (which Moffett paid) for the transfer of

Moffett's deed, and sold him a substitute Mountain Getaways vacation club package.  As with

other transactions, Superior did not actually process a fraudulent conveyance in the first place.

Moffett, presumably not realizing that his deed had never been transferred, defaulted on his

maintenance fee obligations.  Moffett is now saddled with *both* the Wyndham deed obligations

---

[25]WVR asserts this theory of RICO liability for mail or wire fraud in its Supplemental
RICO Case Statement.  (*See, e.g.*, Supplemental RICO Case Statement at p. 24 (stating that
'[t]hese acts constitute wire fraud and mail fraud *and/or facilitate the acts of wire fraud and mail
fraud committed by Superior*.") (emphasis added).)

*and* the Mountain Getaways vacation club package.

Furthermore, the Amended Complaint alleges that SMG and Earle convinced some Wyndham owners to pay $3,000 for a "lawyer" to facilitate the transfer, even though SMG and Earle knew that neither SMG nor Superior had a lawyer or planned to use a lawyer for that purpose. In other words, SMG and Earle transmitted documents to Superior by mail or wire that contained a representation that SMG and Earle knew to be false.

The Amended Complaint also alleges that the entire scheme, both with respect to SMG and TCG, was essentially designed and implemented by Jeff Earle. In substance, the Complaint alleges that Earle (through Mountain Getaways) enlists other entities to perpetrate fraudulent conveyances in coordination with Superior. In addition to whatever money Earle and/or Mountain Getaways can procure on its own by defrauding Wyndham customers and facilitating sham purchases through Superior, Mountain Getaways receives a 10% cut of the TCG's sales from the same scheme. In that sense, SMG (which appears to be under Earle's direct control) and TCG act as "spokes" of the broader conspiracy, of which Earle is the hub. Construing these allegations in the light most favorable to the plaintiffs, the allegations show that Earle and SMG both knew and intended that TCG would utilize Superior to defraud consumers and Wyndham using mail and electronic communications, thereby establishing potential mail and/or wire fraud.

2. Knowledge

Taking the allegations as true, both the Amended Complaint and the Supplemental RICO Case Statement expressly and repeatedly allege that Earle and SMG had the specific intent to defraud both consumers and Wyndham through the alleged racketeering activity. Earle and SMG allegedly knew and intended that Superior would process fraudulent conveyances for SMG and

TCG and that Superior, in fact, did so hundreds of times with respect to Wyndham owners whom Earle, SMG, and/or TCG successfully duped. Moreover, the fact that Superior processed and submitted to Wyndham nearly 200 (and likely more) sham transactions relating to SMG, Mountain Getaways, and/or TCG "customers" – with respect to which Superior allegedly forged signatures, forged notarizations, and often transferred title to third parties without their knowledge or consent – supports an inference that the entities were conspiring to coordinate these transactions.

        3.    <u>Damages</u>

The court discusses WVR's alleged damages in more detail with respect to TCG's Rule 12(c) motion herein. For substantially the same reasons, the court finds that the Amended Complaint has sufficiently alleged activity that Earle and SMG's actions proximately caused the plaintiffs to suffer at least some damages.

Earle and SMG also argue with some force that this case involves, at most, "incidental" or "but for" damages that cannot recovered by WVR, because RICO embodies a direct injury requirement. *See, e.g.*, *Holmes v. Securities Investor Protection* Corp., 503 U.S. 258 (1992); *Pik-Coal Co. v. Big Rivers Elec. Corp.*, 200 F.3d 884, 889 (6th Cir. 2000); *Firestone v. Galbreath*, 976 F.2d 279, 285 (6th Cir. 1992). First, the Amended Complaint alleges direct injury to WVR, and WVR posits that at least some of the transactions at issue (albeit only a few) may have caused it direct injury from the failure to pay maintenance fees. Second, the allegation in this case is that the defendants specifically targeted WVR owners in an effort to substitute the Mountain Getaways vacation club package for that offered by WVR. Whether this conduct, when successful, causes recoverable "direct injury" to WVR – as opposed to injuries that "flow[]

merely from the misfortunes allegedly visited upon [the WVR timeshare owners] by the defendants, *Firestone*, 976 F.2d at 285 – will be evaluated at a later stage with a developed record.[26]

In sum, the court finds that WVR has adequately alleged the elements of its § 1962(c) RICO claim. The Amended Complaint also contains allegations establishing an agreement among Earle, SMG, Superior, and TCG (including the Spigners) to violate § 1962(c).

The court is sensitive to the notion that the fraudulent transactions involved in this case are numerous and (according to the Amended Complaint allegations) intentionally difficult to discover and track, and that Rules 8 and 9(b) do not require a plaintiff's omniscience. Accordingly, the court will not dismiss the RICO claims at this stage. Nevertheless, WVR should anticipate that the court will be more stringent at the Rule 56 stage, when the parties and the court will have the benefit of a developed record.

### B. Fraud

For substantially the same reasons that WVR failed to plead sufficient facts to establish fraud claims against the Spigner Defendants, the allegations concerning Earle and SMG are also insufficient to state a fraud claim. Briefly, WVR has failed to plead with particularity that Earle

---

[26]The court recognizes that its reticence to dismiss the RICO claims requires Earle and SMG to defend claims on which it may ultimately be entitled to judgment because of the causation issue it has raised here. Be that as it may, this case involves a sprawling set of transactions involving multiple entities across multiple facilities, hundreds of transactions (at least), and complex contractual relationships that do not appear to be uniform across all of the facilities at issue. Following discovery, it may be that WVR's RICO claims against SMG and Earle, among other claims, will fail as a matter of law and that Earle and SMG's position that the claims against them are absolutely baseless will prove to be correct. Nevertheless, deciding this case on the issue of causation would be premature and would risk inappropriately applying a "one-size-fits-all" holding to the diverse transactions at issue.

and/or SMG made any fraudulent to statements to WVR and/or that WVR relied to its detriment on any fraudulent statements by Earle and/or SMG.

### C. Intentional Interference with Current and/or Prospective Business Relations, and Procurement of Breach of Contract

Here, Earle and SMG argue that there are "no facts" alleged in the Amended Complaint to support this claim. To the contrary, the Amended Complaint contains allegations establishing each element. The first three elements are plainly satisfied: the plaintiffs had an existing business relationship with WVR owners, Earle and SMG not only knew about that relationship but *specifically* targeted WVR owners, Earle and SMG intended to convince those owners to divest their WVR asset in favor of a substitute Mountain Getaways vacation club package. As to the fourth element, Earle and SMG allegedly (1) made misrepresentations to WVR owners about the nature of the WVR timeshare deeds and the associated maintenance fee obligations to convince the owners that they should relinquish those deeds, (2) represented to each owner, as authorized representatives of Superior, that Superior would facilitate a transaction with a legitimate third-party purchaser, despite knowing that no *bona fide* third-party purchaser was in place; (3) knew that, in connection with new SMG "customers," Superior would fabricate a conveyance; and (4) made misleading representations to WVR owners about the nature of the Mountain Getaways vacation club package and how it compared to the owners' existing WVR package, in an effort to induce owners to cease their business relationship with WVR. If true, these facts fall within one or more of the enumerated categories of "improper means" of competition, including fraud, misrepresentation, deceit, and unethical conduct. *See Trau-Med*, 71 S.W.3d at 701 n.5. As to the fifth element, the court incorporates its analysis of the plaintiffs' damages in other sections

herein.[27]

For essentially the same reasons as the intentional interference claims, the court finds that the plaintiffs have adequately pleaded a claim for procurement of breach of contract. Whether SMG and/or Earle "maliciously" intended to induce a breach of contract is a matter of *scienter* best addressed on a developed record. Also, although Earle and SMG argue that, at most, the allegations establish that they meant to harm timeshares owners *generally*, rather than WVR specifically, that distinction similarly will be tested on a developed factual record.

### D.    TCPA

In some respects, the allegations supporting the TCPA claims against Earle and SMG are less specific than those asserted against the Spigner Defendants. Although the Amended Complaint identifies specific time frames and dates on which the Spigner Defendants allegedly deceived Wyndham owners by giving a false appearance of association with Wyndham and by conducting high pressure sales presentations containing misleading representations about the Wyndham assets, the Amended Complaint does not contain similar specificity with respect to Earle and SMG.

However, the Amended Complaint does allege that Earle and SMG procured $3,000 payments for an "attorney" with knowledge that no attorney would involved, that they executed contracts with WVR owners on behalf of Superior, and that they forwarded those contracts to

---

[27]The court notes that most courts within the Sixth Circuit, including opinions from other judges in this court, have found that the Rule 9(b) heightened particularity requirements do not apply to Tennessee tortious interference claims. *See Price's v. Collision Ctr., LLC v. Progressive Hawaii Ins. Corp.*, 2013 WL 5782926, at *4 (M.D. Tenn. Oct. 28, 2013) (collecting cases). This court has adopted the same assumption and applied only the Rule 8 standard to these claims.

Superior with the understanding and intention that Superior would process a fraudulent transaction that might be legally void or voidable with respect to the transferor. (*See, e.g.*, Am. Compl. ¶ 148.) The Amended Complaint also alleges that Earle and SMG utilized these tactics with respect to numerous specific transactions. (*See id.* ¶ 149.) As WVR states in its response brief, these allegations are sufficient to bring the conduct arguably within the ambit of TCPA §§ 104(b)(5) and/or (b)(12). *See, e.g.*, Tenn. Code Ann. §§ 47-18-104(b)(5) ("Representing that goods or services have . . . characteristics . . . that they do not have . . . ."); and (b)(12) ("Representing that a consumer transaction confers or involves rights, remedies or obligations that it does not have or involve or which are prohibited by law."). The court finds that these allegations are sufficient to state TCPA claims against Earle and SMG at this early stage. At a later stage in this case, based on a developed record, the court will revisit whether the facts can support TCPA claims against Earle and SMG.

### E.  Conspiracy

Having found that the underlying torts will proceed, the court finds that the conspiracy claims against Earle and SMG will proceed.

### F.  Summary

WVR's fraud claims against Earle and SMG will be dismissed. WVR's remaining claims against Earle and SMG will proceed.

## <u>CONCLUSION</u>

The Spigner Defendants' Motion for Judgment and Earle/SMG's Motion to Dismiss will both be granted in part and denied in part. WVM will be dismissed as a party plaintiff relative to all defendants. WVR's fraud claims against the Spigner Defendants and Earle/SMG will be

dismissed.  WVR's breach of the duty of loyalty claim against Spigner will be dismissed.

WVR's remaining claims will proceed.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge