UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| WYNDHAM VACATION RESORTS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:12-cv-00096 |
| | ) | Judge Aleta A. Trauger |
| v. | ) | |
| | ) | |
| THE CONSULTANT GROUP, SMOKEY MOUNTAIN GETAWAYS, LLC, MOUNTAIN GETAWAYS, LLC, JEFF EARLE, SUPERIOR VACATIONS, INC. d/b/a SUPERIOR TIMESHARE CLOSING, RAY SPIGNER, MICHAEL DEAN SPIGNER, CHARLES SIMERKA, JUDITH McGINTY, DANIEL GARRETT, and CHRISTAL FRANKLIN, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM

Plaintiff Wyndham Vacation Resorts, Inc. ("WVR") has filed a Motion for a Preliminary Injunction (Docket No. 198), which requests injunctive relief against all defendants.[1] In essence, WVR seeks an order barring the defendants from continuing to facilitate the transfer of WVR timeshare deeds to certain sham purchasers. Defendants Jeff Earle and Smokey Mountain Getaways at Town Square, LLC ("SMG") have filed a Response in opposition to the motion as it to applies to them only. The remaining defendants have not responded to the motion within the applicable time limitations.[2]

---

[1] In a separate accompanying Order, the court has dismissed purported claims by Wyndham Vacation Management, Inc.

[2] WVR filed its motion on April 24, 2014. Under Fed .R. Civ. P. 6(c)(1) and M.D. Tenn. Local Rule 7.01(b), a party opposing a motion must file responsive materials within 14 days after service of the motion. Accounting for an extra three days under Fed. R. Civ. P. 6(d) and Rule 5(b)(2), responses to the motion were due by May 12, 2014, at the latest.

1

## BACKGROUND

I. **Procedural History**

According to the Amended Complaint (Docket No. 84), the defendants are involved in a conspiracy that defrauds WVR timeshare owners and unlawfully damages WVR in the process. The basic allegations are set forth in the court's previous opinion granting WVR's request for leave to amend and in the court's Memorandum concerning Rule 12 motions filed by two sets of defendants, familiarity with which is assumed.

WVR has moved for a preliminary injunction against all defendants, seeking an order that (1) enjoins the defendants from continuing to facilitate fraudulent transfers to (a) individuals who have not consented to the transfer and/or to (b) "sham" individuals or entities (*i.e.*, entities that are not *bona fide* transferees); (2) enjoins the defendants from charging or quoting upfront fees for the sale or transfer of WVR deeds without having a legitimate, non-sham, third-party purchaser in place; and (3) holding themselves out to the public as employees, agents, or representatives of WVR.

II. **Supporting Materials**

In support of its motion, WVR has filed a Memorandum of Law (Docket No. 199) and supporting evidence, including: (1) affidavits and other exhibits filed in support of WVR's Second Supplement to RICO Statement (Docket No. 191), which include the Declaration of Thomas Garrett (*id.*, Attachment No. 2), and evidence of fraudulent signatures and fraudulent notarizations on conveyance documents relating to the deeds at issue in this lawsuit (*id.*, Attachment Nos. 3-20); (2) an Affidavit of Howard Hamilton, filed in support of WVR's Third Supplement to RICO Statement (Docket No. 193, Ex. 2); (3) deposition transcript excerpts from

multiple party witnesses;³ (4) sworn declarations from third parties;⁴ (5) discovery responses (Ex. 8, Superior responses to interrogatories); (6) record evidence (*id.*, Exs. 11, 12, 21, and 25); (7) a chart and other materials relating to civil and criminal actions that concern fraudulent timeshare transactions (Exs. 28-31); and (8) the Declaration of Eric Haley, a WVR Senior Director, which attaches WVR records relating to the transfer of WVR deeds to sham purchasers. (Docket No. 197.) Notably, none of the evidence references Earle or SMG.

In response, Earle and SMG filed the Declaration of Jeff Earle (Docket No. 206, Ex. 1), which essentially denies that Earle and SMG ever knew about or contemplated that Superior or any other defendant would process or otherwise facilitate a transfer to a sham purchaser. With the exception of that affidavit, which pertains only to Earle and SMG's purported lack of involvement in the transactions at issue, the factual materials filed by WVR are unrebutted.

### III. Facts

The facts show that the Consultant Group ("TCG"), Ray Spigner, Dean Spigner, and at least one of TCG's employees, Casey Hardegree, have held themselves out to WVR owners as Wyndham employees, have otherwise given the impression, at least initially, of being affiliated with Wyndham, and/or have falsely claimed that they are employees of facilities that host timeshare owners. (*See* Declarations of Charles Helle, Jeanette Helle, and Dianne Byrd.)⁵ TCG

---

³ (*See* Docket No. 199, Exs. 1, 9, and 10 (Daniel Garrett); 5, 13, 15, and 19 (Dean Spigner); 14 and 16 (Ray Spigner); 17 (Karen Roque); 18, 22, 23, and 26-27 (Charles Simerka); and 20 (Amanda Farmer).)

⁴ (*See* Docket No. 199, Exs. 2 (Declaration of Charles Helle), 3 (Declaration of Jeannette Helle), 4 (Declaration of Dianne Byrd), and 24 (Declaration of Mark Graber).)

⁵ The Byrd Declaration relates to a non-Wyndham facility, where TCG falsely represents to customers that it is affiliated with that facility.

3

and the Spigners utilize these deceptive practices to lure Wyndham timeshare owners into a high-pressure sales presentation, in which Dean Spigner and others make false and/or misleading representations about the owners' timeshare obligations in an effort to convince the owners to transfer their WVR deeds (in return for a fee) and to purchase a substitute a "Mountain Getaways" vacation club package from TCG.

For example, in June 2012, at the Fairfield Plantation in Villa Rica, Georgia, TCG employees greeted a husband and wife, Mr. and Mrs. Mark Graber, upon their check-in. The TCG employees wore "Wyndham" attire with Wyndham logos, the lobby had a Wyndham banner, and an employee named "Karen" (presumably Karen Roque of TCG) informed the family that "they" (not identifying themselves as TCG) were conducting presentations to assist Wyndham owners in reducing or eliminating their maintenance fees. The couple attended the presentation upon their belief that the presentation was being conducted by Wyndham to assist Wyndham owners. During the presentation, "the owner" (presumably either Ray Spigner or Dean Spigner) informed the audience that he was a former high-level Wyndham employee who had retired.[6] According to Mr. Graber, the presentation was a "high pressure sales pitch trying to persuade us to transfer our Wyndham contracts and purchase Consultant Group's vacation product." TCG's sales presentation "attempted to convince me that my Wyndham contracts were worthless, my maintenance fees would 'sky-rocket,' my timeshare could never be sold[,] and that my children and grandchildren would be struck with my valueless Wyndham contracts."

---

[6] In fact, Dean Spigner had retired on June 3, 2012, which is fewer than 30 days from the presentation that this particular couple attended. WVR alleges, among other things, that Dean Spigner's conduct violated the terms of a non-competition and non-solicitation clause in his "Salesperson Agreement" with WVR, which purported to apply for 12 months from the date of his termination.

The sales pitch was successful: although Mr. Graber did not want to transfer his Wyndham contracts before he entered the presentation, TCG persuaded him to purchase TCG's vacation product for $5,800. The next day, Mr. Graber attempted to cancel his purchase, but TCG refused. Mr. Graber thereafter learned that he had 14 days in which to cancel his contract, at which point he sent a notarized letter to TCG asking to cancel the contract. TCG's "owner" (presumably Ray Spigner or Dean Spigner) called Mr. Graber, refused to cancel the contract, and threatened to sue Mr. Graber and his wife. The owner convinced Mr. Graber to settle the "dispute" for a return of half of the purchase price, or $2,900.

The notes from a TCG presentation, the first slide of which references "Dean Spigner," "Ray Spigner," and "The Consultant Group," reflect the high-pressure sales tactics designed to facilitate a "reverse sale" of an alternative vacation club package. (*See, e.g.* Docket No. 199, Ex. 25 at pp. 2 ("Let's eliminate sky-rocketing maintenance fees! Let's get you the same vacation for less! Let's stop the INSANITY! ------ You need a REAL EXIT STRATEGY TODAY FOR TOMORROW!") and 3 ("Eliminate your [maintenance fees] without irreversible CREDIT DAMAGE").)

In order to "bait and switch" consumers into substituting the alternate vacation club product (the reverse sale), TCG must be able to locate a third-party purchaser for the owner's timeshare interest. The evidence shows that TCG works with Superior Timeshare Closings ("Superior"), a company that purports to conduct title transfers, to effectuate the transfers. Superior does not actually have *bona fide* third-party purchasers in place: instead, Superior routinely processes fraudulent conveyances in the following ways: (1) transferring deeds to individuals without their knowledge; (2) conveying the deeds to "sham" individuals; or (3)

5

holding the deeds in one of seven account numbers corresponding to Daniel Garrett or Superior.[7] In all or nearly all cases, the sham transferee defaults on any maintenance fee obligation and does no further business with WVR.

To accomplish this scheme, Superior commits serious legal violations: it forges signatures and, incredibly, falsely notarizes signatures on many transfer-related documents. This fraudulent activity is ongoing. For example, Howard Hamilton, who is an 82-year disabled widower living with his daughter in Texas, had 19 Wyndham deeds in his name when the lawsuit was filed, and Superior has since transferred an additional 30 deeds to Hamilton. Hamilton was the victim of fraud: he did not consent to these transactions and was never aware of them. Thomas Garrett is the victim of similar fraudulent activity by Superior, which has transferred 26 deeds into his name without his knowledge or consent. These are just two examples. Superior transmits documents reflecting the fraudulent transfers to WVR (which is none the wiser) and often lists false addresses and/or phone numbers for the sham transferees. Superior's sham transferee names have evolved over time – they more recently began transferring deeds to sham purchaser "Danny Joe Spurling," for example – presumably in an effort to evade detection. Assuming that Hamilton and Garrett are being truthful, the degree of Superior's outright fraud is stunning.

Notably, when TCG accosts WVR timeshare owners, TCG presents "Superior" real estate transfer documents to those owners. TCG explains the Superior contracts, has the customers initial a detailed checklist concerning the process by which Superior purportedly will

---

[7] For purposes of linguistic simplicity, the court will refer to these entities collectively herein as "sham" purchasers or "sham" transferees. The relevant point is that they are not *bona fide* third-party purchasers.

process the transaction (in return for a fee), and then TCG signs a "Superior" contract as an "authorized representative" of Superior.

The evidence also shows that TCG entered into a suspicious arrangement with a property manager at the Wyndham Plantation in Villa Rica, Georgia. Under the arrangement, the property manager permitted TCG to solicit non-fixed week owners (in return for a 10% kickback to the property manager), provided that TCG *not* target fixed week owners, who regularly paid maintenance fees. In other words, TCG would not target owners who regularly paid their maintenance fees, presumably because everyone involved knew that the transaction facilitated by TCG and ultimately processed by Superior would be fraudulent, and the property manager did not want paying accounts to go into default upon the "transfer."

WVR has also provided evidence regarding the types of damages it suffers from the fraudulent conveyances. The court addresses that evidence in the "irreparable harm" section herein.

## **RULE 65 STANDARD**

Under Fed. R. Civ. P. 65, the court may issue a preliminary injunction under appropriate circumstances. In assessing whether an injunction is appropriate, the court applies the following standard:

> A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in his favor, and that an injunction is in the public interest.

*Obama for Am. v. Husted*, 697 F.3d 423, 428 (6th Cir. 2012) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "These four considerations are 'factors to be balanced and not prerequisites that must be satisfied.'" *Nat'l Viatical, Inc. v. Universal Settlements Int'l, Inc.*,

7

716 F.3d 952 (6th Cir. 2013) (citing *Am. Imaging Servs., Inc. v. Eagle-Picher Indus., Inc..*, 963 F.2d 855, 859 (6th Cir. 1992)); *Performance Unlimited v. Questar Pubs., Inc.*, 52 F.3d 1373, 1381 (6th Cir. 1993). A district court is required to make specific findings concerning each of the four factors, unless fewer are dispositive of the issue. *Questar*, 52 F.3d 1373, 1381 (6th Cir. 1995).

## ANALYSIS

### I. Likelihood of Success

The unrebutted facts show that TCG and Superior have conspired and continue to conspire to defraud WVR timeshare owners and to draw business away from WVR based on false pretenses. TCG draws in customers (the "bait") by holding itself out as part of "Wyndham," then pivots and, in the context of a high-pressure sales presentation, reveals that it is actually not affiliated with Wyndham (the "switch"). Superior and its employees plainly forge signatures, bear false "witness" to those signatures, and forge notarizations to perform fraudulent transfers to third parties that are not *bona fide* purchasers. TCG signs documents on behalf of Superior, procures fees for itself and Superior in the process, and transmits those documents to Superior, which in turn processes fraudulent conveyances and submits documentation reflecting those fraudulent conveyances to WVR. The sheer volume of these transactions defies coincidence. In the absence of any contrary evidence, it appears that TCG and Superior are coordinating their efforts as part of this scheme.

Unfortunately, WVR's brief lacks any discussion of the specific claims that it believes this fraudulent conduct supports, and why. WVR cites only to a decision by another judge in this district, in which the court granted an unopposed Rule 56 motion by WVR in a case bearing some similarities to the circumstances presented here. Furthermore, WVR fails to draw any

distinctions among the defendants here, even though there are relevant distinctions among many of them. Dean Spigner and Ray Spigner can be grouped with TCG (collectively, the "Spigner Defendants"), a company that (a) they owned and/or operated, and (b) that allegedly engaged in and continues to engage in tortious conduct relative to WVR owners and, arguably less directly, to WVR. Dan Garrett and Christal Franklin can be grouped with Superior (collectively, the "Superior Defendants"), a company that (a) they operated and/or were employed by, and (b) that engaged in and continues to engage in patently fraudulent conduct, including transmitting fraudulent transfer documentation to – and actively deceiving – WVR. Earle and SMG *allegedly* (1) introduced the entire scheme to the Spigner Defendants, and (2) in conjunction with Superior, targeted WVR owners in the same fashion as the Spigner Defendants. Finally, as best the court can discern, Simerka and McGinty allegedly assisted TCG for a brief period in June 2012.

As Earle and SMG point out, for purposes of the Rule 65 motion, WVR's failure to distinguish among these defendants is improper. Even as alleged, the claims apply differently to each group of defendants. Moreover, the evidence presented to the court only implicates certain, but not all, defendants in the alleged scheme. WVR should have tailored its arguments accordingly.[8]

Notwithstanding WVR's cursory approach, the court finds that, relative to certain defendants, WVR has demonstrated that it is likely to succeed on the merits of at least some claims against certain defendants. First, the evidence shows that the Superior Defendants

---

[8] WVR is on notice that the court will have little patience with future failures to distinguish among the defendants and to make tailored arguments with respect to each of them. Presumably as a function of the breadth and duration of the alleged underlying conspiracy, WVR is pursuing a sprawling lawsuit that ropes in many different actors, involves hundreds of transactions, and asserts numerous claims against a diverse array of defendants that are not identically situated. "One size fits all" arguments will not suffice in this case.

actively defrauded WVR directly by processing and submitting fraudulent transfer documentation to WVR for approval. Second, the evidence shows that TCG and the Superior Defendants engaged in deceptive practices in an effort to (1) draw business away from WVR under false pretenses, and (2) cause WVR owners to break (or unknowingly abandon) their contracts with WVR.[9] The evidence also tends to show that TCG and Superior also knew that the fraudulent conveyances would inevitably (1) cause a default in any maintenance fee obligations that run with a deed (whether by operation of the deed or by operation of a separate agreement with the timeshare owners' association), and (2) end any real business relationship between WVR and the holder of the deed. For example, in processing deeds to Howard Hamilton, Superior knew that Hamilton lacked knowledge of (and had not consented to) the transfer of any deeds to his name and that Hamilton would, of course, never pay any maintenance fees or do business with WVR (as the transferor would have). In light of these facts, the court finds that WVR is likely to succeed on the merits of its claims against the Spigner Defendants and the Superior Defendants for RICO violations, procurement of breach of contract, tortious interference with contractual or business relations, common law civil conspiracy, and/or violations of the TCPA.[10]

---

[9] As the court has explained in the Memorandum addressing the Rule 12 motions, the relationships among WVR, timeshare owners, and timeshare owners' associations/trusts are complex. Be that as it may, the court is satisfied that, for purposes of the Rule 65 motion, WVR maintained a direct contractual relationship with timeshare owners and TCG actively marketed its services as a means of terminating that relationship, at least from the transferors' perspective.

[10] The court has dismissed WVR's fraud claims. Also, the court expresses no opinion concerning the breach of contract claims against Dean Spigner, Judith McGinty, and Charles Simerka, which related only to the 12-month period following the respective dates of their termination from WVR and, therefore, cannot be the subject of the instant motion.

On the other hand, WVR has presented no evidence relating to Earle and SMG. The court therefore finds, based on the record before it, that there is no basis to conclude that WVR is likely to prevail on any of its claims against Earle and SMG.[11]

With respect to Simerka and McGinty, WVR has not presented sufficient evidence to support a finding that it is likely to prevail against them. At any rate, even as alleged, Simerka and McGinty at most played only a brief and limited role in the alleged conspiracy in June 2012. There is no evidence of any continuing violations by Simerka and McGinty relative to the deeds at issue in this lawsuit.

In sum, the court finds that WVR is likely to prevail on one or more claims against the Spigner Defendants and the Superior Defendants. The court's analysis of the remaining Rule 65 factors therefore relates only to the claims against the Spigner Defendants and the Superior Defendants.

## II.    Irreparable Harm

"An injury is not fully compensable by money damages if the nature of the plaintiff's loss would make damages difficult to calculate." *Basicomputer Corp. v. Scott*, 973 F.3d 507, 511 (6th Cir. 1992). "The loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute." *Id.* at 512; *Henkel Corp. v. Cox*, 386 F. Supp. 2d 898, 904 (E.D. Mich. 2005) (finding that loss of customer goodwill was "inherently difficult to calculate" and that it was "sufficient to support an injunction"); *Int'l Sec.*

---

[11] Earle and SMG are apoplectic that WVR is pursuing claims against them, and, in the context of their Response to WVR's Rule 65 motion, urged the court to consider the lack of evidence (with respect to the Rule 65 motion) when the court addressed WVR's then-pending Rule 12 motion. Of course, weighing the actual evidence would have been inappropriate with respect to the Rule 12 motion. If Earle and SMG believe that they have been sued in bad faith, they have other means of asserting that issue. *See, e.g.*, Fed. R. Civ. P. 11.

*Mgm't Grp., Inc. v. Sawyer*, 2006 WL 1638537, at *9 (M.D. Tenn. June 6, 2006) (where plaintiff "reasonably demonstrated" that loss of customer goodwill would be difficult to calculate, there was a strong possibility of irreparable harm).

Also, injury to reputation is not fully compensable by money damages and, therefore, can support a finding of irreparable harm. *See United States v. Miami Univ.*, 294 F.3d 797, 819 (6th Cir. 2002); *Economou v. Physicians Weight Loss Ctrs. Of Am.*, 756 F. Supp. 1024, 1039 (N.D. Ohio 1991); *Compuserve Inc. v. Cyber Promotions, Inc.*, 962 F. Supp. 1015, 1027-28 (S.D. Ohio 1997).

WVR has established multiple means by which the Spigner Defendants and the Superior Defendants caused, and continue to cause, irreparable harm to WVR. First, through deceptive marketing practices and deceptive sales presentations, the Spigner Defendants lure in owners who believe the Spigner Defendants are affiliated with WVR, at which point, through a "hard sell" sales presentation, the Spigner Defendants proceed to disparage WVR and/or WVR's contractual relationship with timeshare owners. At least some consumers never learned the identity of the company conducting the presentations. WVR's reputation and goodwill suffers when individuals purporting to be affiliated with WVR disparage the company's relationship with its timeshare owners.

Second, the presentations themselves are designed to convince owners that their contracts with WVR are "valueless," that the consumers risk irreparable credit damage by continuing to hold the deeds, that the maintenance fees associated with those deeds (by whatever mechanism) would skyrocket, and that consumers would never be able to sell them. The entire point of the presentation is to convince WVR's customers to cease doing business with WVR by disparaging

WVR's timeshare "product" and the purported deleterious effect it has on the consumers and their forbears for multiple generations.

Third, by essentially guaranteeing defaults by sham "transferees" on association fees (generally owed to an association, not WVR), the remaining non-defaulting owners are forced to pay higher maintenance fees to cover at least some of the deficiencies that accrue as a result of the fraudulent conveyances. An increase in maintenance fees on the non-defaulting owners naturally makes them unhappy, thereby damaging WVR's reputation and goodwill. In fact, that may be precisely the point: the remaining owners, who are forced to pay increasingly more with each transaction that precipitates a default, will be more susceptible to TCG's marketing of an opportunity to reduce maintenance fees. In that way, the "bait and switch" scheme and the "reverse sales process," which requires an entity like Superior willing to process fraudulent conveyances for TCG, is a downward spiral: the more fraudulent conveyances that TCG and Superior conspire to create, the more business it can generate from remaining owners – except for those owners that any canny (but perhaps unscrupulous) property managers have declared "off limits." Thus, through deception and fraud, the Spigner Defendants and Superior essentially engineer increasing demand for their own "services."[12]

---

[12] On a final note, in briefing related to the Rule 12 motions, some defendants had suggested that, if WVR is correct that the fraudulent conveyances are legally void, WVR should be pursuing the otherwise innocent transferors, rather than the defendants. But what company would want to garner a reputation for suing its own customers, where those customers were duped by unscrupulous fraudsters into paying hundreds or thousands of dollars to process transactions that, unbeknownst to the customers, were not legally binding? One wonders how this argument – that WVR should be suing the victims – would play to a jury. Moreover, forcing WVR into this position would be hopelessly complicated and pointless. To take just one example, the 49 deeds fraudulently placed in Hamilton's name are located in 14 states, which would require somewhere between 14 and 49 actions against *victims* of the conspiracy (*i.e.*, the transferors) in 14 states.

WVR has presented competent evidence showing that the Spigner Defendants and Superior have continued to process fraudulent transfers during the pendency of this litigation. The court finds that these violations are ongoing and, therefore, will continue to cause irreparable harm to WVR's reputation and goodwill for the reasons described in this section.

In sum, the court is persuaded that WVR has suffered, and will continue to suffer, irreparable harm from the activities of the Spigner Defendants and the Superior Defendants.

### III. Balance of the Equities

In assessing the balance of the equities, courts may consider the relative burdens on the parties and third parties who may be affected by the preliminary relief sought. *See, e.g.*, *Obama*, 697 F.3d 423, 436-37 (6th Cir. 2012) (comparing respective burdens of preliminary injunction on voters, the State, and local election boards); *Brake Parts, Inc. v. Lewis*, 443 F. App'x 27, 33 (6th Cir. 2011) ("[T]he district court must consider the harm that the injunction would cause the non-movant"); *see also Eberspaecher N. Am., Inc. v. Nelson Global Prods., Inc.*, No. 12-11045, 2012 WL 1247174, at *6 (E.D. Mich. Apr. 13, 2012) (weighing whether defendant had shown any "concrete, countervailing harm" to itself or the public); *Bokhari v. Metro. Gov't of Nashville & Davidson Cnty.*, No. 3:11-00088, 2012 WL 1165907 (M.D. Tenn. Apr. 9, 2012) (weighing whether defendant had shown substantial harm to others). Notably, even where a preliminary injunction could place the non-movant in financial peril, the court may grant the injunction if the equities so require, such as where a defendant has "knowingly and illegally placed itself in the position to be placed out of business." *Lewis*, 443 F. App'x at 33.

Here, issuance of a preliminary injunction will benefit third parties, particularly WVR timeshare owners who have been victimized by the Spigner Defendants and the Superior Defendants. The injunction would prohibit the Spigner Defendants and the Superior Defendants

14

from engaging in fraudulent real estate transactions, pocketing money from third parties for sham transfers that may not be legally binding, and (at least relative to the Spigner Defendants) from falsely holding themselves out as affiliated with, or acting on behalf of, WVR. Third parties will also benefit from preventing these defendants from clouding title to the timeshare property interests of WVR owners. Of course, the injunction will impair the Spigner Defendants and the Superior Defendants' businesses, but it will only prevent them from engaging in unlawful activity. The requested injunction will not preclude the Spigner Defendants and the Superior Defendants from continuing to engage in *lawful* business activity, such as facilitating legitimate transactions involving actual, *bona fide* third-party purchasers of timeshare interests.

## IV.    Public Interest

The public interest would be served by issuing the injunction. The Spigner Defendants and the Superior Defendants will be enjoined from clouding title to additional real estate interests, perpetrating fraud, and, in some instances, from potentially committing crimes. Similarly, Tennessee public policy, as embodied in the TCPA, strongly discourages and seeks to punish entities that engage in fraudulent business practices, such as those at issue here.[13] *See, e.g.*, Tenn. Code Ann. § 47-18-104(b)(3), (b)(5), (b)(8), and (b)(12). Finally, "the public has an interest in the promotion of fair competition and the discouragement of unfair competition," *Brake Parts, Inc. v. Lewis*, 443 F. App'x 27, 33 (6th Cir. 2011) (brackets omitted), an interest that granting the injunction would serve here.

## V.    Summary

---

[13] Even if WVR did not have standing to maintain the TCPA claims, the public is served by the injunction for other independent reasons, as stated herein.

15

In determining whether a preliminary injunction is warranted, the court's obligation is to balance the four Rule 65 factors. Here, the court finds that WVR has not presented evidence establishing that an injunction should issue relative to Earle and SMG – with respect to whom no evidence has been presented – and Simerka and McGinty – with respect to whom no evidence of involvement after June 2012 has been presented. Therefore, they have not demonstrated a reasonable likelihood of success on the merits and/or that restraining those defendants would prevent irreparable injury and serve the public interest. Accordingly, on balance, the court finds that no injunction related to those defendants is warranted at this time.

However, with respect to the Spigner Defendants and the Superior Defendants, all four factors favor WVR's request for an injunction, and little balancing need be done. Therefore, the court will issue a preliminary injunction that tracks the language of the relief requested in WVR's motion.

For the reasons stated herein, WVR's Motion for a Preliminary Injunction (Docket No. 198) will be granted in part and denied in part.

An appropriate order will enter.

Enter this 14th day of May 2014.

_____
ALETA A. TRAUGER
United States District Judge